My name is Bryce Wilcox and I represent 45 former sugar beet farmers who reside in central Washington. And today we're here to talk about three primary issues. The first being the construction of 7 United States Code Section 7284D, which grants the Commodity Credit Corporation, or the CCC, a security interest in beet crops and sugar beets, and specifically the scope of that particular provision. Second, we're going to talk about another statutory provision, which deals with the requirement of the CCC to obtain adequate assurances from the processors of sugar so that individuals like my clients get paid. And finally, we'll talk about whether or not any protection provided by 7284D covers the proceeds of the sale of sugar beets. My prepared argument tracks the written submittal that I provide to this court, and unless the court has any specific area that it would like me to focus my attention on, I plan just to proceed tracking my brief. Well, the super priority lien seems to knock your clients out. I guess what bothers me is, I understand your argument, but as in tax law, nothing's fair, and life's not fair, and somebody politically zapped you. Now, as I understand your best argument, politicians, those folks controlling the beet industry, decided that they were going to let the CCC hold money so that the sugar producers could produce the sugar. Now, that kind of puts you in a bad spot because you've got your estate mates, and at a certain point, the sugar gets produced, the beets go into the processor, and at a certain point, they become sugar, and at a certain point, they become money. It sounds like your argument is focused on the proceeds, assuming that there is a super lien. Is that right? Yes, Your Honor. And if it's the proceeds, how can the statute that's enacted politically to give somebody an advantage over somebody else who has no constitutional concern at all, how can the statute which gives them a super priority in the sugar be excluded from the proceeds because that seems to be counterintuitive? You've got to do something with the sugar. We're not going to eat the sugar. Everybody wants the money. They want the sugar. So whether you take the sugar and make it into money or let them make it into money, it's all the same thing. Isn't the intent of the statute for the CCC as their super priority to have that money represented by the sugar? It's just following the proceeds. And that's the logic, Your Honor, that the trial court used. Well, it's not only the logic. I'm wondering what – I could use an absurdity argument. It doesn't become sort of absurd if we let the CCC hang on to the sugar while they try to get the money and disadvise it. Thank you very much. Your Honor, in following through with that use of that language of absurdity, I would argue that the whole situation we're in right now is absurd, especially when we look at the intent of the – I couldn't agree with you more, but that's a political decision somebody made somewhere down the line. Take me out of the politics of this and show me we're legally – again, we're not in any constitutional argument, I know. So we're talking about statutory interpretation of the laws and how they interact. Correct. At this stage, we're not in a constitutional – discussing the constitutionality of the statute. Your Honor, the proceeds argument goes to the language of 7284D, the proceed argument. And the trial court, to get ultimately the result that it found, it had to take what it perceived to be a literal interpretation of that statute. And that literal interpretation was that the super priority covered both beets and refined sugar, even though there were modifiers used in conjunction with both phrases that were different. That is, all with reference to refined sugar and all prior with reference to beet sugar. Well, it seems to me sometimes when people take or courts take a strict statutory interpretation, then it's often criticized because they're being too literal. But to adopt your argument, I would read it as we would have to actually insert a word, and it would seem to me the word subsequent, so it would be parallel to prior. So it seems to me that this could be read in a way that prior leans on the crops of sugarcane. That makes sense because those were before. That it's not inconsistent to leave prior there without inserting the new word that you would like, which is subsequent. Would you address that? Certainly, Your Honor. And that would be potentially a basis to put in the word prior, except that you go through with the argument of what good would it do to put prior there if we were talking just about beets, and we trace it all the way through. And that's getting back to the Court's prior question of proceeds. The Court on the one hand, the trial court, took a literal construction of the statute for purposes of rendering decision, and then inserted proceeds. Inserted that, whether it was common sense or what have you,  Then reliance was given to state law, security interest, Article IX, other things, which then integrate the concept of proceeds to follow what arguably is a rational extension of the reasoning behind the statute. The problem my clients have is that we think that there is another way to review the statute, which we've offered to the Court. And I don't think that there can be any logical reading of the statute to give meaning to the word prior, other than the fact that it has to have a reference to a temporal distinction between the beet crop and the refined sugar. And I want to touch back to this proceeds, because I think that is an important issue, and I want to reiterate that, as I understood the trial court's ruling, I know this is de novo, that there just seemed to be no explanation other than the fact that, well, it just has to be there. Even though the Court engaged in a strict statutory construction analysis to begin with, and I think we need to hold Congress to what the statute says. And with all due respect to the trial court, I don't believe that the statute is interpreted correctly, but if it is, it needs to cover proceeds, if that is truly what Congress intended the statute to cover. There's another issue here I think that's important to discuss, and that's the language in 7272E3, and I referenced it earlier, and it has to do with the requirement of the CCC to obtain assurances that the growers get paid. Now, this goes hand in glove with the other portion of the argument that I'm making today. Now, let's look at what the government did. If you look at the government's brief at pages 18 and 19, the government spent about one page discussing this issue, and the only thing that the government did, the CCC did, to satisfy this requirement, a congressionally directed requirement, was to create a regulation that directed the processor to obtain lien waivers. They didn't do anything else. They didn't even put it in the contract, and that's in the court's record at SCR 18 and 19, and that's the contract between PNSC and the CCC. They made no requirement in that contract directly. It requires that my clients ultimately get what Congress intended them to get, which is the price support, the subsidy. What could they have done? What is a reasonable assurance? I suggest that all the CC had to do was require PNSC to post a bond. When they lent this tens of millions of dollars, and they did it in accordance with Congress's directive to obtain reasonable assurance from the processor that my clients get paid, if the processor at the time had posted a bond, that would have satisfied my client's lien interest and we wouldn't be here right now. But there's no requirement in the law that the bond be posted. You're correct, Your Honor. There's no specific bonding requirement other than 7272E3, which requires the secretary of the CCC to obtain adequate, what it deems to be adequate assurances, that my clients get paid. And I would ask that this Court construe that with some sort of a reasonable standard. They've got to make up some provisions to put in there like require a bond. No. Your Honor, I would suggest that what is a reasonable assurance? And I'm suggesting a bond is an example of a reasonable assurance in contrast to the regulation, which the only thing the government did in this case that I can see that was pointed out in the government's brief was to adopt a regulation that said you shall pay them. And there wasn't anything in the contract. They did nothing else that this record supports to show a reasonable assurance. And we look at the Scott's book. But is that a term of the contract of the regulation in effect? I do not believe it's my review of the contract documents. I did not see that regulation. I believe the government's position is that all of the regulations were incorporated by reference into the contract. Then maybe the government will point that provision out of the contract. But it actually says in the regulation that I will not recourse loan recipients. So that would seem to be a matter of federal law, that if you are one of those individuals or entities that you would fall under the regulation. I understand your point that in a way it's just restating the statute but without any practical effect. Absolutely. All they're doing is parodying what Congress told them to do and trying to say you've done enough now. And I would posit that the directive to provide some sort of reasonable assurance goes beyond just adopting a regulation and turning a blind eye to what happens to the money. We can, I think, all fairly agree that the purpose of the statute was ultimately to support the farmers. My clients are not making sugar beets anymore now because of what happened here. I understand. Well, I guess having grown up in a sugar beet state in Wyoming, one of the problems with that argument is that we're left in this administrative deference situation. They need assurances that the secretary considers adequate. And if the secretary then feels that the adoption of a regulation that applies specifically to these nonrecourse loan recipients is adequate, what authority would we have as a circuit court to say, well, we just don't think so? Well, Your Honor, I believe that the answer to that would be the concept of reasonableness. And whether this court looks at that and determines, yes, that's a reasonable exercise of discretion, to simply take the statute, put in a regulation, and call it good, I think the court would have the power to do that. I think, likewise, the court would have the power to look at this and say, that was an unreasonable exercise of discretion to make that determination, to simply put it in a regulation. Counsel, the regulation seems to contemplate getting a subordination of the existing liens. Now, is that, by the regulation, made mandatory if they don't have other assurances that the funds are adequate? Yes, Your Honor, I think the answer, from my perspective, is most definitely yes. The regulation, I believe you're referring to 7 CFR 1435, states that if there are any liens or encumbrances on the sugar pledges collateral, the processor must obtain waivers that fully protect the CCC's interest. Now, what the CCC has done is put that burden on the processor to obtain the lien waivers. And I think when you read that section with the obligation to provide reasonable assurances, if they don't do anything, which in this case they didn't, there's no evidence that the government did anything to see whether or not PNSC, the processor, in this case, obtained those lien waivers. And there's a case that's cited in the material, the Scottsbluff decision. It's a 1990 decision out of the Fifth Circuit. And the court, I think, provided some insight there in terms of the obligation of the CCC. And in footnote 1, the court stated that the CCC could have avoided this suit by checking the liens of the farmers to determine whether other liens on the sugar beets existed. And I think that is illustrative of what we're talking about here, to have some reasonable inquiry, to make sure on a reasonable basis that the PNSC, that the initial recipient of the money, obtained the lien waivers because my clients didn't have to give their beets to the processor. They did so. Well, your clients didn't have to give waiver. I think what's really troubling me about this case, and I understand what you're saying, and I'm troubled by the whole thing too. What seems to be happening here is we have a conflict that the politicians have created. That is, let's protect the growers. Let's make sure that the processor gets liens. Why would a grower give a lien in these circumstances, a lien waiver? I wouldn't give them a lien waiver. So they've created an impossible situation, yet they put no penalty. And in the end, this is where I'm struggling, in the end, they create a super priority in the CCC because they're giving away government money and saying, in the end, you know, if it doesn't happen, you're going to win anyway. Because really, 1435, as the briefs noted, is contrary to the statute. The statute just says, why do you need that get a waiver if you've got a super lien? So the whole thing is all mucked up, and I'm having a problem following how we can give you relief under these circumstances, which seems that the law seems to favor CCC no matter what happens. Well, in addition to the two points I've already raised, which were I think that the court can look at 7272E and the reasonable assurance and make a determination that the secretary did not use adequate discretion in providing those assurances. Point A. Point B, the proceeds argument. I think that the court can adopt a strict construction of the statute under the circumstances it certainly could do, and determine that there is no reference to proceeds. It was Congress's mistake to not have put that language in there, and if Congress wanted the CCC and put us in this position, then we're going to hold them to that, that there was no proceeds. They had the sugar in the discussion. The third avenue, and the one I haven't talked about specifically yet, is the first argument I was going to address, and that is the construction of the statute itself. And we've already briefly touched on that, and I won't belabor the point too much further, other than to say that when you look at the regulation, you look at the CCC's own contract documents, and you look specifically at the notification of CCC security interest, which is evidence record 84, and I think this is very telling, because in this document, this particular document dealt with one of the loans in this case that was sent out to prospective sugar purchasers in September 2001. So this is months after the perfection of our security interest. It states, CCC has previously obtained lien waivers from all prior lien holders who claim an interest in the commodity identified in Part A, which is the sugar, which were superior to the CCC. In the event that the CCC has failed to obtain a lien waiver from a superior lien holder, and the buyer is obligated to make a payment to such lien holder for the purchase of the commodity, CCC agrees to be subject to the actual dollar value of such lien, if, and in print too, the lien is established to be legally superior to the CCC's interest. You can't square that with the statute. That would just be useless language, because there could be, under the government's construction, no situation where there ever would be a superior lien. Interestingly, too, and I find this perhaps equally as troubling as many other portions of this case, in the government's brief at, I believe it's page 5, the government states that the CCC makes UCC filings and agrees to reimburse sugar purchasers should they have to make payment to persons claiming prior liens merely shows CCC's efforts to comply to the extent practicable with the reasonable expectations at play in commercial transactions. I don't understand that. If the government, the CCC, has a super-priority lien, why are they doing all this effort to protect the purchasers of sugar from potential superior liens? I think the why is political. The question is what legal effects does it have here to give? I don't see any rhyme or reason to any of this, to be very frank with you, but I'm wondering what that means to us legally. Legally, Your Honor, again, I think that there's a rational way to construe 7484D to cover just sugar, not sugar beets, to cover sugar beets with a super-priority lien. And I've touched on this, and this case may go on further to the Court of Claims, because I think that if the construction stands, it has resulted in unconstitutional taking, which is not before this Court, but merely is mentioned to highlight... That's why I made sure that I was on the right page. We are not doing it in the Constitution. That's right. If this Court affirms a trial court's construction, the next step would be a constitutional issue in front of the Court of Claims. I think that would be the Court's first avenue to construe the statute in the way suggested. The second would be to make the determination on the assurances, and the third would be to deal with the proceeds. And I'd like to, if I may, unless the Court has questions, reserve the last couple of minutes for rebuttal. That's fine. May it please the Court, I'm Bill Beatty. I'm the Civil Chief, Assistant U.S. Attorney from Spokane, Washington, and I represent the CCC in this particular case. Oh, and the CCC ever lose under the interpretation you give of the statute? To be honest with you, it's as though you've got a bulletproof position here that you're arguing. That is, if the statute means what it says, and you have the super priority over prior liens, and if the processor is supposed to try to get a waiver of prior liens but doesn't, there doesn't seem to be any penalty anywhere, and if you deem it sufficient, whatever you did under 7272, you're bulletproof, aren't you? Well, we pretty much are, but let me put some explanation in here to maybe raise the Court's comfort level on this. Well, I'm not terribly comfortable with the political situation here at all, but, I mean, tell me about it legally. Well, that's what I hope I can do. First of all, let's take a broad look at the program. The program, as the Court pointed out, is government makes these loans to the processors of the sugar. Processors of the sugar are supposed to pay this money to the producers of the sugar, and they're supposed to then pay back the money or give the sugar back to the CCC. Under the program, this takes place in a rapidly paced situation. These loans are very short term, I think nine months, something like that. The regulations, which are attached as appendix to the government's brief, show that the government, the CCC, has strong capabilities here to enforce these loans. If they are not made quickly, the government can go in and seize the property and sell it. The growers can forfeit the sugar, of course, back to us if they can't pay the loan. If I misspoke, I apologize. Well, I want to make sure, because boy, that threw me for a while. Not the growers. Not the growers. No, no, the processors. Processors. Processors, excuse me. In the commercial context of this case, the sugar has to move, so it has to be lean free. Well, my guess is, and I'm not in the business, my guess is the problem comes when the market goes to pot and the producer can convert the beets into sugar real easy, but it's got to sell and you can't eat it. Everybody's got a problem eating the sugar. When the market goes to the devil, you get the sugar, the producer goes out of business, the grower loses, and you've got your super lean to rely on. That's the practicality, right? Essentially, and the regulations cover the manner in which the race is supposed to be sold. It's very tightly controlled. The purchaser of this race has to pay Uncle Sam in the first instance, but it's controlled, it's very strictly controlled. But there's confusion, I think, in some respects here and perhaps on the part of the processor here. We're not talking about elimination of their leans. They're demoted. You're talking on the part of the grower. No, the grower's leans. Well, it's confusing because it's called a processor's lean, but it's in favor of the grower's lean. Right. But the grower's rights, or let's say the processor's leans, there's 48 of them in the book here, in the excerpts of record, 48 leans clogging the title supposedly according to the millions of dollars out here. Right. Attached to the sugar here. The leans of the farmer, or the growers, were not eliminated. They were demoted. They're still on that race. The regulations, as was pointed out, requires the processor to eliminate. And the question is, why should we eliminate those leans if the government's in first place anyway? To eliminate them or subjugate them? They're subjugated. Subordinated. So they're not eliminated by anybody. No, they're still on there. And that's why it's incumbent upon the processor to get the waivers. If the waivers are not obtained, we've got a candy cane covered with ants. No one's going to want it. It's going to be just got too many problems with the title. So it's incumbent upon the processors to eliminate these leans. Now, we also have, of course, 7284, which puts Uncle Sam, the CCC, in first place. So we're first on the property. And when it's sold, we should, of course, be getting the money. But the issue that why should the government get waivers if their lien is so powerful, it's because, yeah, we're powerful, but the liens are still on there. I assume that indirectly this money then gets plowed back into more loans, which is a form of price support, back into the industry. Well, there's a provision. I can't quote it to the court. This is supposed to be run at really no cost to the government. They circulate the money is really what they're doing. They're not forking it out. Right. Just keeps the loans back in once they collect on their priority. Right, right. All you're describing is the fact that economics is screwing up the system. You're going to come out on top. You're going to make your lien, make sure that you get your money back. The lien waiver is sort of an expeditious way to try to get your money, but if they don't give you the lien, you can't put a gun to their head and get it, so you're going to have to go to court and wipe them out. And eventually, if the money is short, they're going to take whatever's left on the bottom end on the second position. And all they're just saying is you shouldn't have that. It's who's going to be in control of the liquidation. If they want to be in control, you're saying, no, Congress, we're in control. Well, technically, too, the loan is not supposed to be made if the processor doesn't get rid of those liens. It's got to be lien-free. Well, it doesn't happen that way. Well, maybe it didn't. Well, they don't have a lien. They're not here. So you obviously don't have the lien waivers in your hand, or we wouldn't be talking here, would we? Well, we don't have the waivers. I think it's definitely sure that we're in first place, though. But, of course, you're in first place because Congress puts you there and that's what you want us to hold. That's right. That's right. And, frankly, I just would like to perhaps just say one more thing, and then I'll sit down. And I've alluded to this before. There's 48 liens on this, supposedly, and that's what they want you to hold, the 48 liens on this race that the government claims first place on. And the 48 liens are, of course, there in the excerpts of record. This is 48 liens from one processor in eastern Washington, as Judge McCown pointed out. We've got many states producing beets and different states. If we look at these liens, the growers brought them in at different times. There's constant circulation here. The potential for lien disputes is pretty high. Therefore, Congress gave the CCC, as part of this program, the right to be in first place. And that, of course, is what we're arguing. And this was a compromise. Those laws that existed before allowed the growers to come back in and try and get the money directly from the government. But the law was changed in 1996. I don't think there's any dispute on that. And the government, as a compromise, the government will make the loans. The government, instead of allowing people to sue it for the recovery of their liens, now is simply only required to do something, as the Secretary sees fit, to enforce it. And, of course, we made a requirement in the regulations that the processor follow that mandate. Just to make sure I'm clear on your last argument, Judge McDonnell, in his decision in footnote 16, recognized the fact that those state liens are going to be out there somewhere. All he did is declare you superior. And if this ever gets the money, I don't know where this is all going, but if the money ever gets out there, it's going to be in various jurisdictions being divided up. And if it ever gets down to that level, they're going to be down to state court fighting out those liens. But all the district judge did and all we're asked to determine is that you have a superior lien. That's correct. That's correct. That's the way we see it. Are you entitled to a superior lien when you haven't given assurances or gotten assurances and gotten the lien subordination or waivers? You said nothing you should have done. Well, we put the regulation out saying that the processors shall pay the producers. And the loan shall not be made unless this happens. Well, that's a condition. But, of course, the loan has to be made before they can get paid. They use the money to pay the producers. I don't know if I'm addressing the first question there. No, you're not answering my question, but maybe there is no answer. I think, Judge, what you're asking is under 7272, where the secretary is supposed to give the assurances that the growers are given, not that they will get paid, what assurances were given relative to this loan that they would be paid. From the grower's point of view, they said we didn't get any assurances. You didn't get the lien waivers. I'm taking for granted that those liens are still there. We wouldn't be here. So what assurances were given that were satisfactory to the secretary in order to make the loans, which are now being asked to be declared in a superior lien position? The regulation is out there, and the contracts incorporate the regulations. Well, all right. What are the assurances, then? They said they didn't get any assurances, and they haven't gotten paid, and they still have liens and there's no waivers. So what assurances did the secretary consider as satisfying 7272? Well, simply the regulations is all I can say, Your Honor. Simply the regulations. I think that it was incumbent upon the processor to do this. The regulations required the processor to do this. Being the processor didn't get a waiver, which you wouldn't get in this real world. That's enough, though. Because the regulation says processor, you get the lien waiver to protect me, and you walk away, and that's sufficient for the secretary. As a practical matter, I think the secretary can rely on the processor and the regulations to enforce this, and I think that's within his discretion. And not to check up on it, though. Excuse me, Your Honor. Not to check up on it, not to. . . I think, again, how much involvement should the secretary have in this? That's a matter of discretion on the part of the executive branch. We may disagree with whether he should get in at all or whether we should get in pretty extensively. You shouldn't see the waivers. Beg your pardon? You shouldn't require the waivers on your desk to look at. Well, I'm not sure how to answer that one. Unless there are any other questions, I'll wait my time. You can take a waiver on that. Just a couple of quick follow-up comments. I think Judge Fletcher's question was an excellent one, and I noted when counsel indicated that technically these loans should not have been given unless the lien waivers, and that jumped out at me as a pretty important factor in this case, that they weren't obtained, and as the court correctly pointed, they probably wouldn't have ever been obtained, but what did the CCC do to assure that that would happen? Nothing. And I think that is the part of this case that is troubling you perhaps the most. It's not necessarily the statutory construction, but it's the 7272 that puts an obligation on the secretary to protect the intended beneficiaries of this statute. And I submit that the CCC completely dropped the ball in this case, and because of that, I think that whatever right they have under the statute has been forfeited, and we cite the Scott's Bluff case, that the CCC has no right to enforce its super priority to the extent it exists. The lien, other two quick points. There is a technical distinction between the lien subordination and elimination, and I can see that these liens have not been eliminated technically by the trial court's opinion, but they have effectively been eliminated. There is not enough money. He just decided where the battle was going to be fought, was going to be topped off. I mean, your liens aren't going away, and there never would have been a waiver in this case. We know that. And the question is whether you can get some sort of interpretation on the narrow issue that the district court decided as whether or not you could trump them and get ahead of them on their liens. And I guess the final point I'd make is that, as just a point of reference, the original statute had a provision for my clients to go to the CCC to get paid in the event of this situation. Congress saw fit to suspend that provision from 1996 to 2002. Near as I can tell, that's gone now. So farmers today can still go back and get payments from the CCC for situations like this. That's all the comments I have. Thank you. The case of Bayer v. Pacific Northwest Sugar Company is submitted and is adjourned for this morning. Thank you.
judges: B Fletcher, Brunetti, McKeown